UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION

| | | |
|---|---|---|
| JEFFREY A. BARR, | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
|     *vs*. | ) | 3:11-cv-00846-jems |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| *Acting Commissioner of the* | ) | |
| *Social Security Administration*, | ) | |
|     *Defendant*. | ) | |

### **ENTRY REVIEWING THE COMMISSIONER'S DECISION**[1]

Plaintiff Jeffrey Barr applied for disability insurance benefits and supplemental security income from the Social Security Administration on August 20, 2007, alleging a disability onset date of May 15, 2007. After a series of administrative proceedings and appeals, including a hearing in April 2010 before Administrative Law Judge ("ALJ") Joseph Jacobson, the ALJ issued a finding on June 18, 2010 that Mr. Barr was not entitled to disability benefits or supplemental security income. In October 2011, the Appeals Council denied Mr. Barr's timely request for review of the ALJ's decision, rendering that decision the final decision of the Defendant, Commissioner of the Social Security Administration ("the Commissioner"), for the purposes of judicial review. Mr. Barr then filed this action under 42 U.S.C. § 405(g), asking the Court to review the Commissioner's denial.

**I.**
**BACKGROUND**

Mr. Barr was twenty-four years old at the time of his disability application on August 20,

---

[1] Judge Jane Magnus-Stinson, a District Court Judge in the United States District Court for the Southern District of Indiana, is sitting by designation in this case. [*See* dkt. 24.]

2007.[2]  [R. 124, 128.]  He has an eleventh-grade education.  [R. 47.]  Prior to his application, Mr. Barr had been working as a machine operator.  [R. 48.]  Mr. Barr's alleged onset date is May 15, 2007, [R. 124], and he claims he is disabled for a variety of impairments which will be discussed as necessary below.[3]  He was last insured for purposes of disability on June 3, 2013.  [R. 15.]

Using the five-step sequential evaluation set forth by the SSA, the ALJ issued an opinion on June 18, 2010.  [R. 13-20.]  The ALJ found as follows:

- At Step One of the analysis, the ALJ found that Mr. Barr had not engaged in substantial gainful activity[4] since the alleged onset date of his disability. [R. 15.]

- At Step Two, the ALJ found that Mr. Barr suffered from the severe impairments of hypertension, stage II chronic kidney disease, and chronic headaches.  [R. 15-16.]

- At Step Three, the ALJ found that Mr. Barr did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  [R. 16.]  The ALJ concluded that Mr. Barr had the residual functional capacity ("RFC") to perform "sedentary work…except that he requires the ability to alternate his position at will between sitting, standing and walking.  In addition, [he] can only occasionally stoop, crouch, kneel, crawl and climb ramps or stairs.  He can never operate machinery and climb ladders, ropes and scaffolds.  [He] also must avoid all exposure to extreme heat and concentrated exposure to unprotected heights and the use of moving machinery.  Furthermore, [he] can perform only simple, routine and repetitive tasks in a low stress job, defined as one with only occasional decision making and/or changes in the work setting." [*Id.*]

---

[2] The ALJ noted that Mr. Barr filed for benefits on August 15, 2007, [R. 13], but the record indicates that he actually applied on August 20, 2007, [R. 124, 128].

[3] Mr. Barr detailed the pertinent facts in his opening brief, and the Commissioner did not dispute those facts.  As the resolution of the issues presented does not require significant factual development, and because the facts implicate sensitive and otherwise confidential information concerning Mr. Barr, the Court will simply incorporate those facts by reference herein.  Specific facts will be articulated as needed.

[4] Substantial gainful activity is defined as work activity that is both substantial (*i.e.* involves significant physical or mental activities) and gainful (*i.e.* work that is usually done for pay or profit, whether or not a profit is realized).  20 C.F.R. § 404.1572(a) and § 416.972(a).

- At Step Four, the ALJ found that Mr. Barr is not able to perform any past relevant work.  [R. 18.]

- Finally, at Step Five, considering Mr. Barr's age, education, work experience, RFC, and the testimony of a Vocational Expert ("VE") the ALJ determined that jobs existed in the State of Wisconsin that Mr. Barr could perform, such as surveillance system monitor and table worker.  [R. 19.]

Based on these findings, the ALJ concluded that Mr. Barr was not entitled to receive disability insurance benefits or supplemental security income.  [R. 20.]  On July 12, 2010, Mr. Barr requested that the Appeals Council review the ALJ's decision.  [R. 8-9.]  On October 27, 2011, the Appeals Council denied Mr. Barr's request for review.  [R. 1-3.]  Accordingly, the Appeals Council's decision became the final decision of the Commissioner for the purposes of judicial review.

## II.
### STANDARD OF REVIEW

The Court's role in this action is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision.  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted).  For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation omitted).  Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), this Court must afford the ALJ's credibility determination "considerable deference," overturning it only if it is "patently wrong."  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court *must* affirm the denial of benefits.  Otherwise, the Court will remand the matter back to the Social Security Administration for further consideration; only in rare cases can the

Court actually order an award of benefits. *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

> To evaluate a disability claim, an ALJ must use the following five-step inquiry:
>
> (1) [is] the claimant…currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment…one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment,…can [he] perform h[is] past relevant work, and (5) is the claimant…capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted). After Step Three, but before Step Four, the ALJ must determine a claimant's RFC, which represents the claimant's physical and mental abilities considering all of the claimant's impairments. The ALJ uses the RFC at Step Four to determine whether the claimant can perform his own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 416.920(e),(g). The burden of proof is on the claimant for Steps One through Four; only at Step Five does the burden shift to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

### III.
#### DISCUSSION

Mr. Barr raises four main arguments on appeal: (1) that the ALJ erred in assessing Mr. Barr's RFC by affording great weight to a medical opinion that supported greater limitations than the ALJ found, and by excluding limitations based on Mr. Barr's headaches, [dkt. 16 at 10-15]; (2) that the ALJ erred in evaluating the opinion of Mr. Barr's treating physician, [*id.* at 15-18]; (3) that the ALJ erred in evaluating Mr. Barr's credibility, [*id.* at 18-23]; and (4) that the ALJ erred in failing to include all of the limitations he assessed in Mr. Barr's RFC in his hypothetical questions to the VE, [*id.* at 23]. The Court will address each challenge in turn.

**A. The ALJ's RFC Assessment**

Mr. Barr argues that the ALJ made two errors in evaluating his RFC – first, he afforded great weight to the opinion of Dr. Carey, but then proceeded to find an RFC that included fewer limitations than Dr. Carey would have imposed; and second, he overlooked evidence and testimony regarding Mr. Barr's headaches. [*Id.* at 10-15.]

*1. Dr. Carey's Opinion*

Mr. Barr argues that, while the ALJ stated that he was basing his findings on the opinion of Dr. Carey, the RFC finding is not consistent with that opinion because: (1) Dr. Carey opined that Mr. Barr was restricted from stooping, bending, squatting, climbing, or operation of heavy equipment, but the ALJ found that Mr. Barr could occasionally stoop, crouch, and climb ramps or stairs; (2) Dr. Carey opined that Mr. Barr could never climb, but the ALJ found that Mr. Barr could climb stairs on an occasional basis; and (3) Dr. Carey opined that Mr. Barr could briefly walk, but the ALJ found that Mr. Barr could walk for up to one-third of an eight-hour workday. [*Id.* at 11-12.] Mr. Barr contends that the ALJ did not explain why he imposed lesser restrictions in Mr. Barr's RFC than are supported by Dr. Carey's opinion, despite giving that opinion "great weight." [*Id.* at 12.] Mr. Barr also argues that Dr. Carey opined that "'the elevation in blood pressure with *activity*…does significantly increase [Mr. Barr's] risk of stroke or other vascular catastrophe,'" so the ALJ was required to determine exactly what activities would put him at risk for medical problems. [*Id.* (emphasis in original).]

The Commissioner responds that Dr. Carey adopted the findings of Mr. Barr's previous primary care physician, Dr. Fasano, who had opined that Mr. Barr could lift a maximum of 10 pounds, engage in brief walking, and was restricted from stooping, bending, squatting, climbing or operation of heavy equipment. [Dkt. 20 at 3.] The Commissioner argues that Dr. Carey did

not identify the extent of the limitations Dr. Fasano imposed, including whether Mr. Barr "had mild, moderate, moderately-severe, severe, or a complete prohibition against such activities." [*Id.*] The Commissioner contends that "[i]n the absence of any description as to the extent of the limitations, the ALJ reasonably interpreted Dr. Carey's March 2010 opinion to mean that [Mr. Barr] had some limitations in those areas, but such activities were not completely and totally prohibited." [*Id.*]

Mr. Barr replies by reiterating his argument that Dr. Carey's opinion contained more restrictive limitations than the ALJ's RFC, and that the ALJ failed to explain why he departed from Dr. Carey's recommendation. [Dkt. 23 at 1-3.]

As to Dr. Carey, the ALJ stated "I assign this opinion great weight because the doctor is very familiar with the claimant's overall medical condition, and the doctor's conclusions are consistent with the other medical evidence." [R. 18.] The ALJ noted that Dr. Carey opined that Mr. Barr "could lift a maximum of 10 pounds and walk briefly but should not stoop, bend, squat, climb or operate heavy equipment." [*Id.*] The ALJ stated that the RFC was "further supported by the opinion of Dr. Carey," [*id.*], but the RFC states that Mr. Barr can "only occasionally stoop, crouch, kneel, crawl and climb ramps or stairs." [R. 16.]

The Commissioner's sole explanation for the ALJ's divergence from Dr. Carey's opinion is that Dr. Carey did not specify the degree of prohibition on these activities, and so the ALJ reasonably interpreted that degree to include "some limitations." [Dkt. 20 at 3.] Dr. Carey stated: "I do feel that work restrictions are appropriate and the restrictions which were recommended by [Mr. Barr's] previous primary care physician, Dr. Fasano, were appropriate including maximum lifting of 10 pounds, brief walking, restriction from stooping, bending, squatting, climbing, or operation of heavy equipment." [R. 527-28.] Dr. Fasano's opinion is not part of the record.

Regardless of whether the ALJ should have interpreted Dr. Carey's use of the word "restrictions" as a complete prohibition or just some degree of limitation, the ALJ was obligated to explain how he arrived at the limitations of "occasional" stooping, crouching, kneeling, crawling, and climbing of ramps or stairs and alternating between sitting, standing, and walking. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (remand necessary where ALJ said opinion was based on doctor's examination, but that examination did not support the opinion and ALJ did not "explain how she reached her conclusions about [the claimant's] physical capabilities"); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (while ALJ is "not required to address every piece of evidence or testimony,…[the ALJ] must provide some glimpse into her reasoning…[and] must build an accurate and logical bridge from the evidence to her conclusion") (citations omitted). Such an explanation is missing from the ALJ's opinion. Additionally, while Dr. Carey used the same word "restrictions" as to operation of heavy equipment, the ALJ stated Mr. Barr "can never operate machinery," and also stated he could "never" climb ladders, ropes and scaffolds. The ALJ does not explain why he interpreted Dr. Carey's "restrictions" on certain activities (*e.g.*, stooping, crouching, kneeling, crawling, and climbing ramps or stairs) to mean "occasional," and interpreted that word as a complete prohibition for other activities (*e.g.*, operating machinery and climbing ladders, ropes, and scaffolds).

Because the ALJ failed to explain how he arrived at Mr. Barr's RFC – and specifically why he concluded that Mr. Barr could occasionally stoop, crouch, kneel, crawl and climb ramps or stairs, and could alternate between sitting, standing, and walking – the case must be remanded for review and, if applicable, further development of that determination.

### 2. *Mr. Barr's Headaches*

Mr. Barr also argues that, once the ALJ found his headaches to be a severe impairment and to be chronic, he was obligated to make a determination regarding the frequency of those headaches and specifically discuss how they affected Mr. Barr's ability to work. [Dkt. 16 at 13-15.] Mr. Barr notes his testimony that his headaches caused blurry vision, that they occurred three to five times a week, that they were triggered by any kind of exertion and stress, that they lasted four to six hours and sometimes longer, and that they were relieved by relaxing in a cool, dark room. [*Id.* at 14.] He also pointed to a finding by Dr. Carey that he suffered from headaches three days a week or more lasting two to four hours. [*Id.* at 15.] The Commissioner responds simply that "Plaintiff relies heavily on Dr. Carey's opinion as 'proof' of his limitations…[y]et, Dr. Carey did not indicate that Plaintiff had any headache-related limitations." [Dkt. 20 at 4.] Mr. Barr reiterates his arguments on reply. [Dkt. 23 at 3-5.]

The Court agrees that once the ALJ determined that Mr. Barr's headaches were a severe impairment and chronic, [R. 15-16], he was obligated to explain either how the RFC accounted for that impairment, or why the RFC did not need to account for it. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected….Notably absent from the ALJ's order is a discussion of how [the claimant's] headaches and blurred vision affected her ability to work"). The Commissioner argues that Dr. Carey did not find that Mr. Barr had "any headache-related limitations." [Dkt. 20 at 4.] But she does not explain why the ALJ, while finding that Mr. Barr's headaches were chronic and a severe impairment, largely ignored them in his RFC analysis.

The ALJ himself stated "once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." [R. 16.] But the only specific mention of Mr. Barr's headaches in the RFC analysis is when the ALJ stated "[t]he medical evidence further documents that, when the claimant adhered to his medication regimen, his headaches improved." [R. 17.] This passing statement does not satisfy the ALJ's obligation to evaluate the intensity, persistence, and limiting effects of the headaches – which presumably still remained even after they had "improved." Remand to fully consider Mr. Barr's headaches and supplement the relevant discussion is necessary.

### B. The ALJ's Evaluation of Mr. Barr's Treating Physician

Mr. Barr argues that the ALJ should have given the opinion of Mr. Barr's treating physician, Dr. Luy, greater weight than he did. [Dkt. 16 at 15-18.] Specifically, Mr. Barr asserts that the evidence shows that he had difficulty controlling his blood pressure even when on medication, that the ALJ does not point to specific treatment notes or records that contradict Dr. Luy's opinion, that one treatment note which stated Mr. Barr was able to "run several blocks" was not enough to show Dr. Luy's opinion was unsupported, that Dr. Luy had actually been treating him for five months and had seen him ten times during that period, and that the ALJ did not specify how Dr. Luy's opinion was "inconsistent with the entire record." [*Id.*]

The Commissioner responds that the ALJ pointed to numerous examples where Dr. Luy's opinion differed from both his own treatment notes and the record as a whole, that the ALJ explained that Mr. Barr's condition was not as severe as Dr. Luy opined when Mr. Barr took his medication, that Mr. Barr saw Dr. Luy for less than five months and Mr. Barr "does not cite any

evidence that suggests that a doctor has a better picture of a patient's condition after ten visits than he does after four," and that Dr. Luy's opinion was inconsistent with Dr. Carey's opinion so the ALJ did not need to give Dr. Luy's opinion the same weight it gave to Dr. Carey's opinion. [Dkt. 20 at 4-7.]

Mr. Barr replies that the Commissioner relies upon evidence that the ALJ did not mention in his opinion so the Commissioner's arguments are post-hoc rationalization. [Dkt. 23 at 5-6.] He also contends that the regulations do not require that a treating physician see a claimant a certain number of times before he or she can reasonably assess the claimant's work-related limitations. [*Id.* at 6-7.]

> In connection with Dr. Luy, the ALJ stated:
>
> [I]n December 2007, Dr. Luy stated that the claimant could sit and stand/walk for 4 hours each in an 8-hour workday. According to Dr. Luy, the claimant could also perform low stress work. The doctor further anticipated that, due to his condition, the claimant would be absent from work more than four days a month….Regarding the opinion of Dr. Luy, the record does not substantiate that, while on his medication, the claimant's condition is as severe as described by the doctor. The doctor's opinion is not well supported by the treatment records and is inconsistent with the record as a whole. Significantly, contrary to Dr. Luy's opinion, only three months prior to making the opinion, in September 2007, the doctor noted in his treatment notes that the claimant was asymptomatic, able to "run several blocks," and had no exertional chest pain….Moreover, at the time the doctor made the opinion, he had only been treating the claimant for 4 months, which is not adequate time to have a longitudinal perspective of the claimant's condition. Because Dr. Luy's opinion is inconsistent with the entire record and his own treatment notes, I give the opinion little weight.

[R. 18.]

The Court is mindful that the standard of review on a challenge to an ALJ's findings is highly deferential, but that deference is not limitless. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d

419, 425 (7th Cir. 2010) (citation omitted). An ALJ need not mention every piece of evidence, but he must build a logical bridge from the evidence to his conclusion. *Id.* "It is not enough for the ALJ to address mere portions of a doctor's report." *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

The ALJ's rejection of Dr. Luy's opinion is based on two specific items – first, that in September 2007 Mr. Barr was "asymptomatic," "able to run several blocks," and had no exertional chest pain; and second, that Dr. Luy had only been treating Mr. Barr for four months. While these statements are true, [*see, e.g.*, R. 280, 285], the Court finds that the ALJ ignored other evidence from Dr. Luy's records which contradict the ALJ's findings. For example:

- During an August 3, 2007 visit, Dr. Luy noted that Mr. Barr complained of "[o]ccasional tightness in the chest depending on activity. Notes elevation of bp's with activity at work." [R. 303];

- On August 16, 2007, Mr. Barr saw Dr. Luy for "follow up htn as well as…spells of blacking out." Dr. Luy noted that Mr. Barr was "[c]ompliant with bp medications," and "[n]otes episodic dizziness as well as shooting numbness in the shoulder and neck. Notes black outs over few seconds….Notes darkening of the peripheral vision. Notes occasional tunnel vision." [R. 296]; and

- On December 20, 2007, Mr. Barr saw Dr. Luy for "follow up htn," and Dr. Luy stated "[n]otes ongoing problems with uncontrolled blood pressure. Still with elevation in bp readings." Dr. Luy stated that Mr. Barr's blood pressure "remains elevated – acute worsening with minimal exertion. Will increase [medication]….Limited ability to function with exertion…." [R. 497, 499].

The ALJ did not discuss the negative findings in Dr. Luy's records, only focusing on the notes regarding running several blocks and not having exertional chest pain.[5] The ALJ is permitted to give greater weight to these notes, but must address contradictory evidence and explain

---

[5] In her response, the Commissioner discussed several items from Dr. Luy's records which she argues contradict Mr. Barr's arguments. But the ALJ did not discuss these items, and the Court must only consider the ALJ's explanation for his decision. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("We have made clear that what matters are the reasons articulated *by the ALJ*" (emphasis in original)).

why he is giving greater weight to the positive notes.  So, while it is possible that the ALJ could have reached the same conclusion regarding Mr. Barr's functional limitations by acknowledging this contrary evidence from the record and building a logical bridge supporting his rationale, that did not happen.  The Court reminds the ALJ that on remand, he must consider Mr. Barr's good days and bad days and determine whether he can hold down a full-time job given the existence of both.  *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case.  Suppose that half the time she is well enough that she could work, and half the time she is not.  Then she could not hold down a full-time job").

### C.  The ALJ's Credibility Determination

Mr. Barr argues that the ALJ's credibility determination was erroneous as contrary to Social Security Ruling 96-7p.  [Dkt. 16 at 18-23.]  In support of this argument, Mr. Barr asserts that the ALJ used boilerplate language disfavored by the Seventh Circuit and "'turn[ed] the credibility process on its head' by first determining Mr. Barr's [RFC], and then rejecting statements which did not support that finding."  [*Id.* at 19.]  Mr. Barr goes on to explain that the reasons the ALJ articulated for his negative credibility finding did not support that finding.  [*Id.* at 19-23.]  The Commissioner responds that, while the ALJ did use the boilerplate language, he also explained why he reached his credibility conclusion.  [Dkt. 20 at 8-11.]  Mr. Barr reiterates his arguments on reply.  [Dkt. 23 at 7-9.]

The ALJ's credibility determination is typically entitled to special deference.  *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it

does the opportunity to observe the claimant testifying"). Although the absence of objective evidence cannot, standing alone, discredit the presence of substantive complaints, *Parker v. Astrue*, 597 F.3d 920, 922-23 (7th Cir. 2010), when faced with evidence both supporting and detracting from claimant's allegations, the Seventh Circuit has recognized that "the resolution of competing arguments based on the record is for the ALJ, not the court." *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002). "[D]etermining the credibility of the individual's statements, the adjudicator must consider the entire case record," and a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

The ALJ stated "I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [R. 17.] This boilerplate language is disfavored because, among other reasons, it "puts the cart before the horse, in the sense that the determination of [RFC] must be based on the evidence…rather than forcing the [claimant's] testimony into a foregone conclusion"; but the use of this boilerplate language does not always necessitate reversal of the ALJ's decision. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). "If the ALJ has otherwise explained his conclusion adequately, the inclusion of this language can be harmless." *Id.*

Here, the ALJ went past use of the boilerplate language and explained that he concluded Mr. Barr's testimony was not credible because: (1) Mr. Barr's doctor had encouraged him to exercise and not be so sedentary, which is contrary to Mr. Barr's testimony that any exertion raised his blood pressure and caused him to black out; (2) Mr. Barr has been able to "interact with and

have three girlfriends in 2007 and 2008," which is contrary to his statement that he spends most of his time in bed; (3) the evidence suggests that he is not compliant with taking his medication, which suggests that his symptoms may not have been as limiting as he alleged; and (4) Mr. Barr acknowledged that he can do certain chores, which undermines his testimony that he barely engaged in daily activities. [R. 17-18.] Based on this explanation for his credibility determination, the ALJ's use of the boilerplate language does not, by itself, render the ALJ's conclusion erroneous. The Court finds, however, that the ALJ's reasons for discounting Mr. Barr's credibility are troubling.

First, the ALJ's statement that "the claimant has been encouraged by his doctor to exercise and not be so sedentary," [R. 17], is not entirely accurate. The medical records reflect that Dr. Thomas noted on January 15, 2010 that "[a]t this time, Jeffrey will be scheduled for a treadmill stress echocardiogram….Should the stress test be acceptable, he will begin a walking exercise program at least 30 minutes daily." [R. 477-78.] While the records then reflect the results from a January 27, 2010 echocardiogram, [R. 479-80], there is no evidence that Mr. Barr was then instructed or encouraged to begin an exercise program. The ALJ's statement to that effect is not reasonably inferred from the record.

Second, the ALJ's reliance on Mr. Barr's ability to "interact with and have three girlfriends in 2007 and 2008," [R. 17], is also not supported by the evidence. The only mention of "girlfriends" in the record is a statement in a January 24, 2008 medical record that Mr. Barr "has had three partners in the last one year." [R. 467.] Mr. Barr was also accompanied on that doctor visit by his girlfriend at that time. The Court finds that, even given Mr. Barr's description of the limits on his activities, Mr. Barr still could have maintained relationships by interacting with his partners on his good days, and there is no evidence – and the ALJ does not cite to any -- indicat-

ing what activities, if any, Mr. Barr and the three partners engaged in, or the nature or length of the three relationships.

Third, the ALJ's reliance on evidence that Mr. Barr did not take his medication is flawed. The evidence indicates that, when Mr. Barr did not take his medication (as opposed to many visits reflecting that he was taking his medication), it was due to not being able to afford it. [*See, e.g.*, R. 292, 476, 528.] The ALJ should have considered Mr. Barr's explanation for not taking his medication, but instead did not question him at all regarding his inability to pay and simply discredited his description of his condition because he was not taking his medication. This was improper. *See Thomas v. Colvin*, 2013 U.S. App. LEXIS 16747, *16 (7th Cir. 2013) ("[A]n ALJ must consider reasons for a claimant's lack of treatment (such as an inability to pay) before drawing negative inferences about the claimant's symptoms") (citing *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013)).

Finally, the ALJ's reliance on Mr. Barr's ability to complete certain activities of daily living is problematic. Specifically, the ALJ pointed to Mr. Barr's ability to drive, cook, do the laundry, shop, clean the house, do the dishes, vacuum, and watch his ten year-old child. [R. 17.] An ALJ can consider a claimant's daily activities when assessing his alleged symptoms, but the Seventh Circuit Court of Appeals has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (referencing 20 C.F.R. § 404.1529). Recently, the Seventh Circuit strongly criticized the common practice of ALJs equating activities of daily living to employment, noting that "[t]he critical difference between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons…and is not held to a min-

imum standard of performance, as [he] would be by an employer." *Hughes v. Astrue*, 705 F.3d 276, 278-79 (7th Cir. 2013). Given the Seventh Circuit precedent criticizing placing undue weight on those activities, and the fact that the other reasons for the ALJ's adverse credibility finding were not valid as discussed above, the Court concludes that the ALJ erred by relying on those activities to make an adverse credibility determination and this case should be remanded for this additional reason.

### D. The ALJ's Questions to the VE

Mr. Barr argues that the ALJ erred at Step Five because he failed to question the VE regarding a job that would allow him to walk at will. [Dkt. 16 at 23.] The Commissioner argues in response that the VE explicitly considered whether Mr. Barr would have a "walk" option in connection with the table worker job when he explained that the worker may not be able to move around the conveyor belt, and in connection with the assembly job when he stated that the worker may be able to walk around the table. [Dkt. 20 at 12.] As to the surveillance system monitor job, the Commissioner does not argue that the VE considered whether there was a walk option, but only that he did not eliminate that job from consideration. [*Id.*] Mr. Barr asserts on reply that even if the surveillance system monitor job meets the walk option requirement, the case should be remanded because there would only be one job that would accommodate him. [Dkt. 23 at 9.]

It is well-established that when an ALJ poses a hypothetical question to a VE, the question must include all limitations supported by medical evidence in the record. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *see also Jelinek*, 662 F.3d at 813 ("ALJs must provide vocational experts with a complete picture of a claimant's residual functional capacity…."); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) ("Hypothetical questions posed to vocational ex-

perts ordinarily must include *all* limitations supported by medical evidence in the record") (emphasis in original).  The ALJ's questioning of the VE relating to the sit/stand/walk option was as follows:

> Q:  If I would add that this person must have a sit stand option, would that change your answer?
>
> A:  Yes, sir.
>
> Q:  In what way?
>
> A:  As assembler, if he's on an assembly line and there are other workers around, he may not be able to move around the conveyor belt or the table that he's at.
>
> Q:  Uh-huh.
>
> A:  So that may interfere with his performance, and quality of his work, and the percentage of being on task.
>
> Q:  Okay.  So that, assembly would be, it would –
>
> A:  Assembly would be ruled out.
>
> Q:  Be ruled out, okay.  Any –
>
> A:  Surveillance monitor, sit and stand, job can be modified so he can sit and stand looking at the monitor.
>
> Q:  Okay, and table worker?
>
> A:  Table worker, same reason, would be ruled out as the assembly job because if there's other table workers around there, he may be able to walk around the table but, again, the stress of having other workers being next to him may increase the anxiety.
>
> Q:  Okay, well, I'm not talking about walking around the table, I'm just –
>
> A:  Right.
>
> Q:  -- the, the, the work, the work can be performed either sitting or standing, the job that allows –
>
> A:  It could be performed either sitting or standing, correct.

> Q: Okay. So the table worker would still be available?
>
> A: Table worker would still stay in there.

[R. 72-73.]

The Commissioner argues that the VE implicitly considered whether an individual could walk at will when she was asked about the availability of a sit/stand option, but the questioning does not support that argument. For example, the VE specifically noted for the surveillance monitor job that the job could be modified so the individual "can sit and stand looking at the monitor." [R. 73.] This type of modification would not be feasible for an individual who has to have the option of walking, unless they could see the monitor the whole time while walking. The VE did not discuss whether Mr. Barr would be able to walk as a surveillance monitor, and the ALJ did not ask. The VE initially eliminated the table worker job because, though she noted he "may be able to walk around the table," she was concerned about "the stress of having other workers being next to him," [*id.*]. When the ALJ eliminated the stress factor from the equation, the VE only noted that the job could be performed either sitting or standing. [*Id.*] In fact, the ALJ specifically excluded the walk option from the question, stating "I'm not talking about walking around the table, I'm just -- …the work can be performed either sitting or standing…." [*Id.*] In short, the ALJ did not question the VE regarding whether the positions of surveillance monitor or table worker could be performed with a walk option – a restriction undisputedly included in Mr. Barr's RFC. This failure also warrants remand.

## IV.
### CONCLUSION

For the reasons stated herein, the ALJ's denial of relief is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion pursuant to 42 U.S.C. § 405(g) (sentence four). Judgment shall issue accordingly.

**Distribution via ECF only to all counsel of record**

Case: 3:11-cv-00846-jems Document #: 25 Filed: 11/05/13 Page 19 of 19

- 19 -